WEIBERG, Guardian, Appellant, vs. KELLOGG and others, Respondents.

*September 24—November 17, 1925.*

*Highways: Law of the road: Statutes: Construction: "Center of intersection:" What constitutes: Trial: Questions for submission to jury.*

1. The three provisions which constitute the subject of regulation of travel on public highways in sub. 1, sec. 1636—49b, Stats. 1921, must be construed together to effectuate the intent of the legislature, in view of the presumption that the legislature intended to pass a workable and practical statute and one which does not lead to absurd results.   p. 105.

2. When a statute in its literal sense creates a provision which is unworkable and which leads to absurd results, it becomes a proper subject for construction.   p. 106.

3. Where the authorities in charge of public roads acquiesced in the use by the public of two diverging traveled tracks across an intersection, which acquiescence together with the failure of the authorities to maintain the entire highway created an abandonment for travel purposes of the space between such tracks, and the southeasterly track could not be used by one going north because of the physical situation without extreme difficulty, the "center of intersection," within the meaning of sub. 1, sec. 1636—49b, Stats. 1921, was a meeting of the medial lines of the intersected highway and the northeasterly traveled track.   p. 106.

4. It is the duty of litigants desiring to submit to the jury for decision issues of fact in addition to those presented and litigated to present proper questions to the court thereon. p. 107.

APPEAL from a judgment of the circuit court for Walworth county: E. B. BELDEN, Circuit Judge. *Reversed, with directions.*

The action is one to recover damages for personal injury. The Delavan-Fontana highway, hereafter referred to as the "Delavan road," is a north-and-south highway in Walworth county, and is somewhat over three rods in width, and is intersected by the Walworth road, an east-and-west highway

of practically the same width as the Delavan road. Both highways have located thereon a traveled track about twenty feet in width, and a short time prior to the collision herein referred to, the Delavan road north of the intersection of the two highways named had been resurfaced with a layer of new gravel, which was lying loose upon the surface and had not yet been packed by vehicles traveling thereon. The intersection of these two highways differs from intersections generally in the state, in that the Walworth traveled track a short distance to the west of the intersection divides into two forks, one extending in a generally northeasterly direction, which prior to the collision was used by vehicles in passing to the north onto the Delavan road and to the east on the eastern extension of the Walworth road; the other fork extending to the southeast, and is used by travelers going south on the Delavan road. To the east of where these two forks begin is located a triangular grass plot, which was not subjected to use for travel purposes by operators of vehicles on these two roads. This unusual physical situation has resulted from the fact that the Walworth road extends east from the Delavan road some distance north of that part of the Walworth road west of the Delavan road; and it appears that the north line on the Walworth road, extended, would, west of the Delavan road, strike the eastern extension in about its center line. North of the triangular plot above referred to, and just before entering the traveled track of the eastern extension of the Walworth road, is another triangular grass plot.

On the day of the accident the plaintiff was operating a motorcycle east on that part of the Walworth road west of the intersection, and when he arrived at a point in the road where the two forks above referred to branch off, he proceeded along the northeasterly fork to the right of the traveled portion, and when he arrived at a point a considerable distance to the east of the medial line of the Delavan road, the defendant *Maude Kellogg*, who was operating

an automobile south on the Delavan road, collided with the motorcycle, which resulted in producing the injuries herein complained of.

The case was submitted to the jury on a special verdict, and the jury found (1) that the defendant *Maude Kellogg,* at the time of the collision, was driving her automobile at an excessive rate of speed under the physical conditions which she knew to exist at the intersection; (2) that such excessive speed was a proximate cause of the collision; (3) that the defendant *Maude Kellogg* negligently failed to slow up or stop and permit the plaintiff to cross the intersection in front of her automobile; (4) that such failure was a proximate cause of the collision; (5) that the defendant *Maude Kellogg* was negligent in turning her automobile to the left just prior to the collision; (6) that such act was a proximate cause of the collision; (7) that there was no negligence on the part of the plaintiff, under the circumstances shown by the evidence, in failing to look to the left as he drove his motorcycle across the traveled track of the Delavan road to the point of collision. "(8) If you answer question 7 'Yes,' then answer this question: Was such failure to look to the left a proximate cause of the collision? *A.* No." (9) That the plaintiff, *Carl Weiberg,* was not guilty of negligence, under the circumstances shown by the evidence, in driving his motorcycle at the speed at which he drove it across the intersection. "(10) If you answer question 9 'Yes,' then answer this question: Was such want of ordinary care a proximate cause of the collision and the injuries sustained by *Carl Weiberg? A.* No." (11) That there was no negligence on the part of *Carl Weiberg* in the management and control of his motorcycle at the time and just prior to the collision. "(12) If you answer question 11 'Yes,' then answer this question: Was such want of ordinary care in the management and control of his motorcycle a proximate cause of the collision and the injury sustained by *Carl Weiberg? A.* No." (Question 13 omitted

as not pertinent on this appeal. Question 14 found the damages at $10,000.)

Upon the usual motions after verdict the court ordered that the complaint against the defendant H. E. Kellogg be dismissed because it appeared that he was not the owner of the automobile, and for the further reason that *Maude Kellogg* was not acting as his agent in driving the automobile at the time of the collision. It also ordered judgment in favor of the other two defendants, dismissing the complaint, notwithstanding the verdict, on the ground that it appears from the uncontradicted evidence in the case, conclusively, that the plaintiff was negligent in a manner which proximately contributed to his injuries, by failing to pass to the right of the intersection of the two highways above mentioned; and it overruled the motion of the plaintiff for judgment upon the special verdict. Judgment was thereupon entered in accordance with such order, and the plaintiff appealed from that part of the judgment directing a dismissal of his complaint as to the defendants *Mrs. H. E. Kellogg* and *Maude Kellogg*.

For the appellant there were briefs by *Godfrey & Wilson* of Elkhorn, and oral argument by *Alfred L. Godfrey*.

For the respondents there was a brief by *E. L. von Suessmilch* and *C. J. Sumner,* both of Delavan, attorneys, and *Jeffris, Mouat, Oestreich, Avery & Wood* of Janesville, of counsel, and oral argument by *Otto A. Oestreich.*

DOERFLER, J.    The defendants herein on this appeal contend that the center of the intersection of the two roads is at a point where the medial lines of the two roads meet; that it is undisputed that the plaintiff in crossing the intersection did not pass to the right of this point; that such failure must be held as a matter of law to be negligence and the proximate cause of the injury; and in support of their position they rely upon the case of *Day v. Pauly,* 186 Wis. 189, 202 N. W. 363. On the other hand, the plaintiff

contends that the center of the intersection to which the statute is applicable in this case is not the center claimed by the defendants, but a point where the medial lines of the northeasterly traveled track of the Walworth road are intersected by the medial line of the Delavan road; that by consent of both parties the action was tried upon that theory; that the questions submitted by the court to the jury were the only issues which were actually tried; that there is an abundance of evidence in the record to sustain the answers of the jury to all of the questions submitted; that the defendants requested no additional instructions than those given by the court; nor did they request questions other than those in the special verdict to be submitted to the jury.

We have examined the record carefully and are of the opinion that there was ample credible evidence to support the answers of the jury to all of the questions of the special verdict of the jury, and no useful purpose could be served by a review or consideration of the evidence in that regard.

When the *Day Case* was before this court for determination, owing to the peculiar situation there pertaining, we deemed it our duty to give full recognition to the provisions of the statutes, and we felt that an express legislative provision should not be indiscriminately ignored or set aside unless it violated or infringed on the fundamental law. There was nothing, however, in the facts as they appeared in that case which prevented the plaintiff from following out the letter and spirit of the law. While the triangle in that case was not definitely marked on the highway, although for demonstration purposes it was so marked on the drawing included in the opinion, it nevertheless existed. In the *Day Case* it was the custom, apparently without exception, for travelers to pass over this triangle and thus "cut the corner." The course so pursued by travelers in the *Day Case* was the natural one, and they were induced to pursue this course by marks upon the pavement indicating the same. No traveled track or tracks appeared in the evidence in that case for

the reason that the pavement was made of concrete, and the course pursued by travelers was adopted for the sake of convenience and to economize time. The highway was in excellent condition, and for all practical intents and purposes the statutory provision could have been fully recognized and heeded. In the instant case, however, the two branches, as they diverged from the single traveled track, were well defined and outlined, evidencing a continual use of such traveled tracks over a long period of time. Between these two diverging tracks was located the triangular grass plot, which was not used excepting on rare occasions by the traveling public for the purposes of travel. Originally we can assume that the entire highway was laid out and designed for the purposes of travel. It can also be assumed that these two traveled tracks resulted not from the act of the public authorities having in charge the construction and maintenance of the highway, but by the traveling public, the latter being actuated to pursue the course which it did for reasons of convenience and for saving time. However, in the course of time, by nonuser, the triangular plot became covered with grass, and the evidence does not show that the public authorities, after the construction of the road, paid any attention whatever toward maintaining this plot for travel purposes. So that while the public authorities having charge of highways maintained the two branches or traveled tracks referred to, they did not maintain the triangular plot. While this triangular plot was susceptible for travel purposes and was available therefor, it cannot be said or inferred that during all seasons of the year it could be reasonably safely used for travel purposes. It requires no argument to persuade one to arrive at the conclusion that, during the rainy periods of spring and fall, travel upon such a plot would not only be attended by great difficulty but may be absolutely dangerous. The public authorities, therefore, having in charge the maintenance of this Walworth road at all points, acquiesced in the use by

the public of the two diverging traveled tracks, which acquiescence, together with their failure to maintain the entire highway for travel purposes, created in a sense an abandonment for travel purposes of the space included within the triangle. The south triangle formed an acute angle at its southerly point. It may be said that it was not impossible for a traveler coming from the west to pass down the southeasterly traveled track and then make the turn onto the Delavan road. This, however, could not be done, by reason of the physical situation, without extreme difficulty, and apparently could not be done by the mere turning of the machine. It would require some backing and propelling, and during this time the south track of the road would be unduly obstructed. So that, in whatever light we view the facts in this case, it presents a physical situation infinitely more troublesome than that presented in the *Day Case.*

As said in the statement of facts, the instant case is unusual. From an early date the public authorities have been engaged in laying out, constructing, and maintaining highways. During the early history of the state the lands of the state were but sparsely settled, and the pioneers were poor and financially unable to lay out, construct, and maintain modern highways. In laying out their highways they generally followed the course of least expense and least resistance. Therefore, in the course of time and within the memory of most of us, highways were laid out not on a direct line, so as to afford the shortest course possible between two given points, but were laid out irregularly along a course which would require the least expense and labor. The conditions thus existing were in a large measure responsible for the creation of situations such as we find at the junction of the two highways involved herein. It is only since the advent of the use of automobiles upon a large scale, and since the adoption of the first highway amendment, that highways have been straightened, direct and continuous connections made, and improved upon a large scale;

but all this was done, as will appear from the records, at an expenditure of many millions of dollars, and at a time when the wealth of the inhabitants and the interests of the state had enormously increased so as to enable the raising of the necessary means by taxation and in other ways. But notwithstanding the tremendous improvement in highways during the last quarter of a century, there still exist curved and crooked roads, highways with narrow traveled tracks, many instances where the traveled tracks are not in the center of the highway but close to one side or the other, and where highways do not run along a straight, continuous course, but where there is a jog, as is shown herein, and it will still require the expenditure of an enormous sum of money before all of the ideals in highway construction are reasonably accomplished. Until such ideals have been accomplished, the travelers on our highways will be obliged to be content with the highways as they now exist.

The legislature is composed of members in its two branches coming from all sections of the state. When the highway statutes were enacted, no one had better knowledge of the actual conditions existing than the members of this law-making body, and it must be assumed that when they did legislate upon the subject they had fully in mind all of the various highways as they then existed. We must also assume that it was their desire, in their highway statutes, to enact laws which would be practical and which would meet the situations as they existed.

With the facts above related and referred to, the legislature enacted sub. 1, sec. 1636—49b, appearing in the Statutes of 1921, which were the statutes in effect at the time this accident happened, and which reads as follows:

"Whenever a person operating a motor vehicle shall meet on a public highway any other person riding or driving a horse or other draft animal, or any other vehicle, the person so operating such motor vehicle or vehicles, or riding or driving a horse, or other draft animal, shall each seasonably

turn to the right of the center of the beaten track of such highway so as to pass without interference. Any such person so operating a motor vehicle or motorcycle shall, on overtaking any such horse, draft animal or other vehicle, pass on the left side thereof, and the rider or driver of such horse, draft animal or other vehicle shall, as soon as possible and with all convenient speed, upon signal, turn to the right of the center of the beaten track of such highway so as to allow free passage on the left, and if necessary on account of road condition, such driver of said draft animal or other vehicle shall stop for sufficient length of time to allow said automobile to pass. Any such person so operating a motor vehicle shall, at the intersection of public highways, keep to the right of the center of such intersection of such highway when turning to the right and pass to the right of the center of such intersection when turning to the left."

It will be noted that in the first two provisions of the section quoted the statute is aimed at the course of travel with respect to the *beaten track*. In the third provision, which constitutes a regulation for travelers at intersections, the words "beaten track" are not used. The entire width of a highway in the country is seldom, if ever, used for the purposes of travel. That portion of the highway is used which is prepared for such purpose by the public authorities, and this is the part upon which the beaten tracks appear. To use any other portion which was not intended for public travel, and to use which might be dangerous, would in itself be evidence of negligence. Along both sides of the beaten tracks are found grass plots, weeds, depressions, and drains, all of which indicate to the traveler on the highway that he must remain on the beaten track. With these facts in mind the legislature enacted sub. 1, sec. 1636—49b, and in such section, on two occasions, it expressly used the words "beaten track." All of the three provisions which constitute the subject of regulation in this statute must be construed together in order to effectuate the intent of the legislature. Had the entire intersection in the instant case constituted the beaten track, and had the

space occupied by the triangular grass plots been properly maintained by the public authorities for the purpose of public travel, there can be no question but that travelers on these two roads would have been obliged to follow the literal meaning of the statute with respect to the point of intersection of the two highways. But inasmuch as these triangular grass plots had not been maintained for the purposes of public travel by the public authorities, such plots create a situation not dissimilar to that which exists along nearly all country highways, where the sides are covered with grass and weeds and where depressions and drains exist outside of the beaten tracks.

These views must be adopted as expressive of the legislative intent, in view of the presumption that the law-making body, with full knowledge of actual conditions existing, intended to pass a workable and practical statute and one which does not lead to absurd results. It is the spirit of the entire law pertaining to the construction and maintenance of highways to afford reasonably safe places for public travel, and it is the very essence of statutes regulating public travel to promote the safety and welfare of the traveling public.

When a statute in its literal sense creates a provision which is unworkable and which leads to absurd results, it becomes a proper subject for construction, and with the foregoing matters in view we are constrained to hold that the center of the intersection referred to in the statute quoted, as applicable to the instant case, is the meeting of the medial lines of the Delavan road and the northeasterly traveled track of the Walworth road.

We are well aware of the language used in the opinion in the *Day Case,* and which reads as follows:

"In this connection we think it our duty to call the attention of highway officials and police officers to the fact that they have no right or authority to divert or direct public travel in a manner contrary to that prescribed by the act of

the legislature. It was apparently indicated to the plaintiff that he should travel in substantially the path he took, but travelers are not warranted or justified in proceeding according to the direction of highway officials, police authorities, or local municipal bodies, where such directions are contrary to the express provisions of the law, and travelers are afforded no protection because they are thus induced to violate the law." Page 193.

We admit that the language in the *Day Case* is quite broad and comprehensive. However, the court in writing the opinion in that case had in mind the situation as presented by the facts in that case, and the decision in that case must be viewed in the light of such existing facts. We have heretofore pointed out in this opinion the differences existing between the facts in the *Day Case* and those in the instant case, and have arrived at the conclusion that the doctrine announced in the *Day Case* should not be extended to apply to a case like the one before us.

All the issues presented and litigated by the parties upon the trial were submitted to the jury and were decided favorably to the plaintiff. If the defendants had any additional issues of fact to be decided, it was their duty to present proper questions to the court thereon. We have carefully read and considered the instructions given by the court pertaining to the right-of-way statute, and we are convinced that they correctly stated the law, and that they were substantially phrased in the language of this court as used in the decision in the case of *Bertschy v. Seng,* 181 Wis. 643, 195 N. W. 854.

The defendants argue that they are entitled to a new trial because the damages are excessive. The record discloses that the plaintiff suffered a painful and serious permanent injury. Suffice it to say, without reviewing the evidence on this subject, that we are of the opinion that it fairly warranted the amount of damages found by the jury, and we therefore feel that this award should not be changed and that a new trial should not be granted.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded with directions to enter judgment in plaintiff's favor against the defendants *Maude Kellogg* and *Mrs. H. E. Kellogg (Edith Kellogg)* for the amount awarded by the jury.